## FOR PUBLICATION



FILED

Nov 05 2013, 5:53 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**BENJAMIN D. R. VANDERPOOL**
Vanderpool Law Firm, P.C.
Warsaw, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) | |
| S.L. & D.L. (Minor Children) | ) ) | |
| And | ) ) | |
| K.M., (Mother) & D.L., (Father), | ) ) | |
| Appellants/Respondents, | ) ) | |
| vs. | ) ) | No. 85A02-1304-JT-308 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee/Petitioner. | ) | |

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen, III, Judge
Cause Nos. 85C01-1109-JT-26 and 85C01-1109-JT-27

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

In late 2011 and early 2012, a trial court held three hearings to determine whether K.M.'s ("Mother") and D.L.'s ("Father") parental rights to their son and daughter should be terminated. The State presented its evidence at the first two hearings, and Mother presented her evidence at the third hearing. Father was incarcerated in federal prison and federal authorities would not allow him to attend the hearings or participate by phone. The parties agreed that Father would receive a transcript of the State's evidence against him (the first two hearings) and he would have two months to respond through counsel. After receiving the transcript of the State's evidence, Father chose not to respond or present additional evidence.

The trial court ultimately terminated Mother's and Father's parental rights. On appeal, Mother and Father challenge the sufficiency of the trial court's findings. They also challenge the court's conclusion that the conditions resulting in the children's removal from their care will not be remedied. We conclude that the trial court's findings of fact are sufficient and the evidence warrants termination in this case. Father also argues, belatedly, that his due-process rights were violated because he was not permitted to attend the hearings and was not given a transcript of the third hearing, at which Mother presented her evidence. But Father makes this due-process argument for the first time on appeal; thus, this argument is waived. Waiver aside, Father agreed to this procedure and was ably represented by counsel throughout the proceedings. Father fails to establish

how he was prejudiced—much of Mother's evidence overlapped with the State's evidence, and Father received a transcript of the State's evidence. And he makes no argument that the outcome would have been different had he also received a transcript of the third hearing, at which Mother presented her evidence. We affirm.

**Facts and Procedural History**

In early 2011, Mother took four-year-old D.L. and three-year-old S.L. to a Wabash County Department of Child Services ("WCDCS") office. She told WCDCS employees that she could not care for the children and that in frustration, she had struck D.L. in the face. WCDCS took custody of the children and filed a petition alleging that they were children in need of services ("CHINS").

Mother admitted the CHINS allegations. At a separate hearing, Father also admitted the allegations. At the time, Father, who had been convicted of child molesting, was incarcerated.[1] He was released at the end of January 2011. To facilitate reunification with the children, Mother and Father were ordered not to use drugs and to participate in a variety of services, including substance-abuse assessments, random drug screens, individual counseling, parenting assessments, and other home-based services. The parents were also ordered to participate in supervised parenting time with the children.

Father was sent back to prison shortly after his release for violating the terms of his parole. While he was incarcerated, Mother obtained a protective order against him based on allegations of past domestic violence. Mother also claimed that Father had

---

[1] The record does not reveal whom Father was convicted of molesting.

sexually molested the parties' older daughter K.H., and Mother said she worried that he might molest S.L. or D.L. Based on these allegations and Father's child-molesting conviction, WCDCS filed a motion to suspend Father's parenting time. The trial court granted the motion.

Mother's participation in services was sporadic and ultimately unsuccessful. Several times, Mother tested positive for marijuana, methamphetamine, and synthetic drugs. Mother failed to complete individual counseling, home-based services, and the required parenting assessment. She also failed to attend supervised parenting time regularly. WCDCS filed a petition to terminate Mother's and Father's parental rights.

Father was released from prison again in February 2012. One month later he was arrested at Mother's home for violating the protective order and failing to register as a sex offender. He was incarcerated for the duration of the termination proceedings.

The trial court heard evidence on the termination petition over two days in August and September 2012 and a third day in February 2013. WCDCS requested that Father be transported to court for the hearings or allowed to participate by phone, but those requests were denied by federal authorities.[2] Before the first hearing, WCDCS, Mother, Mother's counsel, and Father's counsel met with the trial court to discuss alternate ways in which Father could participate. The parties ultimately agreed that WCDCS would present its evidence at the first and second hearings, and the trial court would then have a transcript prepared and sent to Father, who would have two months to review the transcript and communicate with counsel. Mother would present her evidence at the third hearing.

---

[2] It seems these requests were denied because Father was "in transit," and "nobody really kn[ew] where or what [federal] facility he [was] being transported to." Tr. p. 5-6.

At the first two hearings, WCDCS presented evidence regarding the parents' troublesome relationship and their failure to complete services. Specifically, Mother continued to be involved with Father despite his child-molesting conviction and her belief that he had molested one of their children.[3] She referred to him as a "sick, sick man" who "has a problem masturbating to children." Tr. p. 93, 147. Mother also failed to successfully complete court-ordered services and used drugs, particularly marijuana, throughout the termination proceedings, despite being ordered not to do so. According to Mother, marijuana was a "friend, family member, a way of life." *Id.* at 59. When asked if she would stop smoking marijuana, Mother said she did not know. *Id.* at 152.

Father made a similar lack of progress toward reunification. He completed a parenting assessment, but no other services. Service providers testified that they could not work with Father due to his repeated incarceration. When Father received the transcript of the evidence presented by WCDCS, he indicated that he did not intend to "present any additional evidence in opposition to what had been previously testified to at the hearing[s]." *Id.* at 161.

Mother's circumstances had changed by the third hearing. She was incarcerated on drug-related charges and awaiting trial, but she was able to attend the hearing. She told the court that she had participated in some drug-related services in prison and now understood that she could not smoke marijuana. Mother again referred to Father as a threat to children, but when asked if she would cut ties with Father in the future, she gave

---

[3] Mother later attempted to minimize her allegation that Father had molested K.H. by saying that Father had merely stood over the child and masturbated while the child slept. Tr. p. 144. There is no indication that Father was convicted of molesting K.H.; these appear to be separate incidents.

conflicting answers. *Id.* at 186-97. She asked the trial court to "hold off" on terminating her parental rights. *Id.* at 180.

In March 2013, the trial court terminated Mother's and Father's parental rights. Appellants' App. p. 21-24. Mother and Father now appeal.

**Discussion and Decision**

On appeal, Father argues that his due-process rights were violated because he was not permitted to attend the termination hearings and was not given a transcript of the third hearing, at which Mother presented her evidence. Jointly, Mother and Father challenge the sufficiency of the trial court's findings and the court's conclusion that the conditions resulting in the children's removal will not be remedied.

**I. Due Process**

Father argues that his due-process rights were violated because he was not permitted to attend the termination hearings and was not given a transcript of the third hearing, at which Mother presented her evidence. But Father did not challenge this procedure at the trial level; instead, he raises his due-process argument for the first time on appeal.

The State must satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution when it seeks to terminate the parent-child relationship. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006) (citation omitted), *trans. denied*. Due process in parental-rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the

6

countervailing government interest supporting the use of the challenged procedure. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011) (citing *A.P. v. Porter Cnty. Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *reh'g denied*, *trans. denied.*). The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of his or her child. *Id.* (citation omitted). And the State's interest in protecting the welfare of a child is also substantial. *Id.* Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions. *Id.*

Any procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. *A.P.*, 734 N.E.2d at 1112-13. Nevertheless, a parent may waive a due-process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003); *see also In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (by raising issue for first time on appeal, mother waived due-process claim that trial court violated her rights in failing to follow statutory requirements governing permanency hearings, case plans, and dispositional orders). Father never raised any due-process claim at the trial level; therefore, he has waived his constitutional challenge with respect to the termination proceedings. *See McBride*, 798 N.E.2d at 194-95.

Waiver notwithstanding, we cannot agree that Father was denied due process because he was not permitted to attend the termination hearings. Father was incarcerated in federal prison at the time and federal authorities refused to allow him to attend the

7

hearings or participate by phone. The trial court did not decide that Father could not attend; the matter was entirely out of the trial court's control. Because Father could not attend, he was given a transcript of the State's evidence (the first two hearings), and had two months to review the transcript and communicate with counsel. And Father was ably represented by counsel at all three hearings. *See Tillotson v. Clay Cnty. Dep't of Family & Children*, 777 N.E.2d 741, 746 (Ind. Ct. App. 2002) (Proper representation by counsel in a termination proceeding significantly decreases the risk of an inaccurate result.), *trans. denied*. In light of these facts, and because our Courts have held that there is no absolute right to be present at a termination hearing, we cannot say that Father was denied due process simply because he was not permitted to attend the hearings. *See C.G.*, 954 N.E.2d at 921 (surveying other jurisdictions and concluding that there is no absolute right to attend a termination hearing).

However, Father also challenges the alternative procedure used to facilitate his participation at the hearings. In *C.G.*, our Supreme Court noted that if a parent cannot attend a termination hearing, a trial court may "continu[e] the hearing after the State has presented its case and allow[] the parent time to review a transcript or audio tape of the hearing and then respond to allegations raised by the State's witnesses." *Id.* at 920 (citing *Tillotson*, 777 N.E.2d at 746). That is what the parties agreed to do in this case. Despite this agreement, Father now argues that his due-process rights were violated because he did not receive a transcript of the third hearing, at which Mother presented her evidence. For a number of reasons, we disagree.

8

Father claims that "because no later transcript of Mother's evidence was sent to [Father], he was not given the opportunity to hear or respond to any evidence or testimony presented by [Mother]." Appellants' Br. p. 23. This is not accurate. Mother testified at the second hearing, during the State's case. At the second hearing, she discussed Father's sexual tendencies toward children at length, saying that Father was a threat to children, including his own. Tr. p. 143, 150. She also discussed the protective order against Father, *id.* at 143, and said that Father "has a problem masturbating to children," *id.* at 147. Father received a transcript of this testimony but chose not to respond to it or to present additional evidence. Nor did he, through counsel, request a transcript and time to respond when Mother testified similarly at the third hearing, during the presentation of her evidence.

The State and the parent have substantial interests affected by termination proceedings; thus, the factor at issue is the risk of error. We conclude that the risk of error here was low. Father received a transcript of the State's evidence—which included Mother's testimony about him at the second hearing—and had two months to respond through counsel. He was ably represented by counsel at all three hearings, which significantly decreased the risk of an inaccurate result. Moreover, Father fails to establish how he was prejudiced—he makes no argument that the outcome would have been any different had he also received a transcript of the third hearing, at which Mother presented her evidence.

When considering due process in termination cases, our Courts have long recognized that parental rights "constitute an important interest warranting deference and

protection," while simultaneously acknowledging that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *C.G.*, 954 N.E.2d at 917 (citations omitted). Having considered Father's rights at length, we also note that his children, S.L. and D.L, have a significant interest in securing permanency and finality. We conclude that Father's due-process rights were not violated in this case.

## II. Trial Court's Findings of Fact

The parents argue that the trial court's findings of fact are erroneous because they are simply a recitation of the evidence presented during the termination hearings. "A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z." *Parks v. Delaware Cnty. Dep't of Child Servs.*, 862 N.E.2d 1275, 1279 (Ind. Ct. App. 2007) (citation omitted). Instead, "[a] finding of fact must indicate, not what someone said is true, but what is determined to be true, for that is the trier of fact's duty." *Id.* "[T]he trier of fact must adopt the testimony of the witness before the 'finding' may be considered a finding of fact." *Id.* (citation omitted).

We do not agree that the trial court's findings are merely a recitation of the evidence presented at the termination hearings. While the order references evidence, it also contains thoughtful findings that flow from that evidence. For example, the trial court found that

> Mother has put her relationship with [F]ather and her desire to smoke marijuana above the interests of her children, her protestations to the contrary notwithstanding. At times she professes love for [F]ather while also acknowledging his multitude of problems. She has described him as a "sick, sick man." She claims she will no longer be in a relationship with

10

him when he is released. That is beyond belief and her past actions underscore the lack of credibility of such a claim.

*　　*　　*　　*　　*

Remarkably, Father, when not incarcerated, was better at complying with services than Mother[,] though not fully compliant. However his history underscores his instability. He is simply bad for the children. It is wholly against their interests to be reunited with either Mother or Father. The parents' issues consume their lives, to the detriment of their children.

Appellants' App. p. 23. The order also contains detailed findings regarding Mother's demeanor during the termination hearings:

Mother's behavior throughout these proceedings was somewhat bizarre and she was admonished to control her behavior on more than one occasion. The court recognizes the emotional turmoil [that] hearings such as these can have on all the participants. However, Mother's behavior appeared far more unusual than what the court usually observes. To say the least, Mother is very, very troubled and emotionally distraught. She does not seem to be in touch with reality.

*Id.* The termination order clearly identifies the reasons for terminating the parents' rights in this case. We find no error here.

### III. Termination of Parental Rights

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental rights are "not absolute and must be subordinated to the child's interests when

determining the proper disposition of a petition to terminate parental rights." *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citation omitted). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Here, the trial court made specific findings and conclusions in its termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.B.*, 888 N.E.2d 231, 235 (Ind. Ct. App. 2008) (citation omitted), *trans. denied*.

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

    (B)    that one (1) of the following is true:

        (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

        (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

        (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). In addition, the State has the burden of pleading and proving each element of Indiana Code section 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. On appeal, Mother and Father challenge the sufficiency of the evidence supporting the trial court's judgment as to subsection (B)(i) of the termination statute detailed above. *See* I.C. § 31-35-2-4(b)(2)(B).

When determining if there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home will not be remedied, a trial court must judge the parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (citations omitted). The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, and failure to provide support. *Id.* The trial court may also consider the services offered to the parent and the parent's response to those services as evidence of whether conditions will be remedied. *Id.*

13

The purpose of terminating parental rights is not to punish the parent but to protect the children involved. *In re D.B.*, 942 N.E.2d 867, 872 (Ind. Ct. App. 2011) (citing *In re K.S.*, 750 N.E.2d at 832). The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all of a parent's rights to his or her children. *Id.* (citing *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008)). "Termination of parental rights is therefore intended as a last resort, available only when all other reasonable efforts have failed." *Id.*

### A. Mother's Rights

In determining that there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home will not be remedied, the trial court concluded that Mother put her own interests before her children's. The court cited Mother's drug use during the termination proceedings and her ongoing relationship with Father despite her concerns that he had molested one of their older children and posed a threat to D.L. and S.L. The court also explained that Mother made no progress in her ability to parent the children because she did not complete services. Finally, we note that Mother was incarcerated at the time of the final hearing and awaiting trial on drug-related charges.

In challenging the evidence underlying the trial court's findings, Mother makes a number of claims. First, she argues that she voluntarily surrendered her children to WCDCS, which shows she is capable of exercising good judgment. But the trial court acknowledged this in its order. *See* Appellants' App. p. 22 ("Mother brought the children to [WCDCS] . . . because she was unable to care for them. She deserves credit for doing

that."). Mother also argues that her marijuana use is "not a sufficient reason" for terminating her parental rights. Appellants' Br. p. 19. She claims that "there are many people in the United States that agree with her about marijuana" and cites the legalization of recreational marijuana use in other states as support for her claim. *Id.* Assuming for the sake of argument that this is true, Mother fails to acknowledge that recreational marijuana use is not legal in Indiana and, more importantly, that one of the prerequisites for reunification with her children was that she not use marijuana. Nonetheless, Mother used marijuana frequently during the termination proceedings.

Mother goes on to argue that at the time of the last termination hearing, she finally understood that using marijuana was illegal and that she had recently tested negative for all substances. But at that time, Mother was incarcerated and her access to illegal substances was limited. To the extent Mother suggests that she was putting her drug use behind her, the trial court was entitled to weigh her statements at the last hearing against her history of drug use. And we may not reweigh that evidence or assess the credibility of Mother's testimony on appeal. Similarly, Mother's remaining arguments regarding her use of synthetic cannabinoids and her relationship with Father are requests to reweigh the evidence, which we may not do.

## B. Father's Rights

In determining that there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home will not be remedied, the trial court found that Father made no progress in services because of his incarceration. Though the court found that he was more compliant in services than

Mother, his history—particularly his repeated incarceration—was proof of his instability. The trial court concluded that Father was "simply bad for the children." Appellants' App. p. 23. He, too, was incarcerated at the time of the termination hearings.

Father argues that his inability to complete services due to incarceration is not a sufficient reason to terminate his parental rights. He compares his circumstances to those in *M.W. v. Indiana Department of Child Services*, 943 N.E.2d 848 (Ind. Ct. App. 2011), *trans. denied*. The father in *M.W.* was incarcerated three times during CHINS and termination proceedings, with the final period of incarceration ending shortly after the trial court's termination order. *Id.* at 855. The *M.W.* Court noted that the trial court focused on the father's incarceration, parenting-time compliance, and lack of employment and residence. *Id.* But noting the father's "many strides" in completing the reunification plan and his impending release following the termination hearing, the Court found that the father's "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time." *Id.* (quotation omitted). The Court reversed the termination of the father's rights.

*M.W.* is distinguishable. Put simply, Father poses a specific threat to his children that was absent in *M.W.* He is a convicted child molester. Mother repeatedly stated that he is a threat to children. More importantly, she testified that he is a threat to *his own* children and recounted one instance in which Father stood above his sleeping child and masturbated. At the time of the hearings, the significant concerns about Father's behavior toward children had not been addressed—much less remedied—due to his repeated incarceration.

16

We conclude that there is clear and convincing evidence to support the trial court's findings and the court's ultimate determination that there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home will not be remedied. We therefore affirm the trial court's judgment terminating Mother's and Father's parental rights.

Affirmed.

BAKER, J., and FRIEDLANDER, J., concur.